**Judy Ann JOHNSON, Plaintiff–Appellant,**

v.

**ESTATE OF Wesley H. MCFARLIN, Deceased, by and through its duly appointed Personal Representative, Rebecca J. LINDSTROM, Defendant–Respondent.**

**No. SD 30149.**

Missouri Court of Appeals, Southern District, Division Two.

Oct. 7, 2010.

Motion for Rehearing or Transfer Denied Oct. 29, 2010.

470

Jacob Y. Garrett, West Plains, MO, for Appellant.

Andrew K. Bennett, Springfield, MO, for Respondent.

JEFFREY W. BATES, Judge.

Judy Johnson (Johnson) and Wesley McFarlin (McFarlin) were romantically involved and lived together from 1993 to 2007. Johnson appeals from a judgment in a court-tried case denying her unjust enrichment claim against McFarlin's estate. We affirm.

In 1988, Johnson was married and worked at a Wal–Mart store in Ava, Missouri. She met McFarlin at the store's Christmas party. In 1989, Johnson got divorced. She began living in a rented apartment in Ava. McFarlin lived in a small home that he owned in Ava. He had inherited this gray, two-bedroom house (hereinafter, the Gray House) from his mother. He also owned a 27–acre cattle farm and a 120–acre farm (hereinafter, the Brown place) in Douglas County.

In 1990, Johnson became reacquainted with McFarlin. They began dating about six months later. At that time, Johnson was 40 years old. McFarlin was 68 years old. Johnson and McFarlin continued to date for the next year or two. They got engaged in 1992, but they never married.

In 1993, Johnson moved into the Gray House with McFarlin. At the time, Johnson's property consisted of a car, the furniture in her apartment and a $15,000 certificate of deposit she had purchased with funds awarded to her in the divorce. McFarlin was a retired John Deere employee. He had a bank account in his name only at Century Bank (the Century account). He received $850 per month in pension benefits and $900 per month in social security benefits which were directly deposited into the Century account. He also ran a business that generated between $6,000 to $10,000 per year for providing brush-hogging, hay cutting and hay baling services to others. These earnings also were deposited into the Century account. Although Johnson was living with McFarlin, she left her furniture in her apartment. She continued to rent the apartment for the next two years. The rent, which was over $200 per month, and the utilities were paid from her own bank account. She deposited enough money out of her paycheck into her account to pay these monthly expenses. The remainder of her check was deposited into the Century account titled in McFarlin's name alone. Johnson contributed about $500 per month to the Century account for the first few years and about $600 per month for the last few years. She had no idea how much money was already in that account when her funds began to be deposited in it. All of Johnson's living expenses were paid out of the Century account. This included Johnson's expenses for housing, food, clothing, automobile insurance, medical bills, cell phone, credit cards, etc.

After Johnson moved into the Gray House, McFarlin decided to build a larger home. In 1993, he sold 15 acres of river-bottom farmland for $14,895. In August 2004, he used $4,000 of the proceeds from this 1993 sale to purchase a lot, titled in his name only, for the new residence. Around that same time, McFarlin sold the Brown place and netted $88,900. A builder was hired to construct the new house, and construction began in October 1994. During the period of construction, Johnson was working five days per week. She helped stain the woodwork for the house and did a little bit of the painting. The rest of that type of work was done by the builder's wife. The construction costs were paid from the Century account. McFarlin had not been required to borrow any money to purchase either the lot or any of the construction materials. In April 1995, the new house (hereinafter, the

Residence) was completed at a cost (including the lot) of $84,000 to $88,000. Johnson was told by McFarlin that he was putting the title to the Residence in his name alone. Johnson understood that arrangement and was satisfied because all of her living expenses were being paid out of the Century account. From the time Johnson moved into the Gray house until construction on the Residence was completed, Johnson deposited approximately $12,000 into the Century account.

In 1994, McFarlin bought a $10,000 pickup for Johnson to use. In 1995, McFarlin bought a 1995 Lincoln for $17,500 for Johnson to use. Both of these purchases were made using funds from the Century account.

In 1996, McFarlin bought some real estate from his brother for $40,000. This property (hereinafter, the Rental Property) consisted of a two-bedroom house, a small commercial property and an older, three-bedroom house. The Rental Property was titled in McFarlin's name alone. Johnson was aware of how this property was titled. She continued to deposit her earnings into the Century account pursuant to their arrangement that all of her living expenses would be paid from that account. McFarlin borrowed the entire sum needed to purchase the Rental Property from his bank. He was the only person who signed the promissory note. The $500 per month payments on the loan were made from the Century account. After purchasing the rental property, McFarlin was able to collect enough rent each month to pay the mortgage payment. These rent payments, along with a $200 per month payment that McFarlin received as rent on the Gray House, were deposited into the Century account.

In 2000, McFarlin bought a 2000 GMC pickup for $25,900 for Johnson to use. This purchase was made using funds from the Century account. In March 2002, Johnson's name was added to the Century account. The income McFarlin received from his pension, social security benefits, brush-hogging business and rental properties was substantially greater than the income that Johnson contributed to the account.

On June 12, 2003, McFarlin sold the Gray House for $30,000. Two or three weeks later, he used the proceeds of that sale to pay off the $16,600 balance on the loan for the Rental Property. McFarlin continued to receive $500 per month from the Rental Property, which was deposited in the joint Century account. In addition, the remaining $13,400 from the sale of the Gray House was deposited into the joint Century account.

In September 2006, McFarlin developed cancer. In April 2007, while McFarlin was ill, $14,000 from the joint Century account was used (in addition to trade-ins) to purchase a 2007 Envoy for $24,000 that was titled in the names of McFarlin and Johnson. The cancer treatment was unsuccessful, and McFarlin died on May 14, 2007. At no time before McFarlin died did Johnson ever tell him that she was asserting a claim against the Residence or the Rental Property.

At the time of McFarlin's death, he and Johnson were the joint owners of a $30,000 certificate of deposit. Johnson received the proceeds of this certificate of deposit. Johnson also still had the certificate of deposit she had purchased in 1989, plus its accumulated earnings since that time. The value of this certificate at the time of McFarlin's death was $30,000. Johnson received $3,300 that remained in the Century account and McFarlin's 2007 income tax refund in the amount of $3,174. She also kept the 2007 Envoy and furniture from the Residence.

An estate was opened for McFarlin in the Circuit Court of Douglas County (hereinafter, the Estate), and Rebecca Lindstrom was appointed as personal representative. The Estate's inventory included: (1) the Residence, valued at $133,500; and (2) the Rental Property, valued at $75,000. The latter property was sold and generated $61,561 in net proceeds for the Estate.

In April 2008, Johnson filed suit against Personal Representative Lindstrom. The petition asserted a claim for unjust enrichment against the Estate. With respect to the Residence, Johnson alleged that she made financial contributions to the cost of construction and provided labor in the completion of the home. Johnson also alleged that she had made "significant financial contributions" to the acquisition of the Rental Property. Johnson asked that she be awarded one-half of the appraised values of these properties, plus attorney's fees.

Johnson's unjust enrichment action was tried to the court in July 2009. The court found against Johnson because she failed to meet her burden of proving that she had contributed funds used to buy either property. Instead, the court decided that the evidence proved McFarlin's funds were used for the purchases. Judgment was entered in favor of the Estate, and this appeal followed.

In this court-tried case, the judgment must be affirmed unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Ewanchuk v. Mitchell,* 154 S.W.3d 476, 478 (Mo.App.2005); Rule 84.13(d).[1] The credibility of the witnesses and the weight to be given to their testimony is for the trial court, which is free to believe none, part or all of the testimony of any witness.

*Christian Health Care of Springfield West Park, Inc. v. Little,* 145 S.W.3d 44, 48 (Mo. App.2004). This Court defers to the credibility determinations of the trial court "because it is in a better position to not only judge the credibility of witnesses directly, but also their sincerity and character as well as other trial intangibles which may not be completely revealed by the record." *Tichenor v. Vore,* 953 S.W.2d 171, 174 (Mo.App.1997); *Brown v. Brown,* 152 S.W.3d 911, 913–14 (Mo.App.2005); Rule 84.13(d)(2). An appellate court accepts all evidence and inferences therefrom in the light most favorable to the prevailing party; all contrary evidence and inferences are disregarded. *Essex Contracting, Inc. v. Jefferson County,* 277 S.W.3d 647, 652 (Mo. banc 2009); *Strobl v. Lane,* 250 S.W.3d 843, 844 (Mo.App.2008). The trial court made a number of factual findings. "All fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached." Rule 73.01(c); *see Tom's Agspray, LLC v. Cole,* 308 S.W.3d 255, 261 (Mo.App.2010).

We will exercise our power to set aside the trial court's judgment on the ground that it is against the weight of the evidence with caution and only if we possess the firm belief that the judgment is wrong. *MC Development Co., LLC v. Central R–3 School, Dist. of St. Francois County,* 299 S.W.3d 600, 602 (Mo. banc 2009); *Simpson v. Strong,* 234 S.W.3d 567, 578 (Mo.App. 2007). The phrase "weight of the evidence" means its weight in probative value, rather than the quantity of evidence. *Nix v. Nix,* 862 S.W.2d 948, 951 (Mo.App. 1993). The weight of the evidence is not determined by mathematics, but depends on its effect in inducing belief. *Id.*

1. All references to rules are to Missouri Court Rules (2010).

Johnson presents one point on appeal. She contends the trial court's judgment is against the weight of the evidence because a party who makes contributions during a period of cohabitation acquires an interest in property accumulated through mutual efforts. Johnson argues that she made significant contributions to a marital-type relationship which have value and for which she should be compensated. In support of this argument, Johnson cites *Hudson v. DeLonjay*, 732 S.W.2d 922 (Mo.App. 1987); *Marvin v. Marvin*, 18 Cal.3d 660, 134 Cal.Rptr. 815, 557 P.2d 106 (1976); *Turner v. Freed*, 792 N.E.2d 947 (Ind.Ct. App.2003); and *In re Estate of Roccamonte*, 174 N.J. 381, 808 A.2d 838 (2002).

We begin by noting *Hudson*, *Marvin*, and *Roccamonte*, all involved claims based upon breach of an express or implied-in-fact contract.[2] The only theory of recovery pleaded in Johnson's petition, however, was unjust enrichment. Johnson is bound by her theory in the trial court, and she will not be permitted to change theories on appeal. *Johnson v. Duensing*, 332 S.W.2d 950, 957 (Mo.1960); *Am. Standard Ins. Co. of Wis. v. May*, 972 S.W.2d 595, 601 (Mo. App.1998). Accordingly, Johnson's reliance on *Hudson*, *Marvin*, and *Roccamonte*, is misplaced. We confine our review to whether the trial court erred in rejecting Johnson's unjust enrichment theory of recovery. *See Surrey Condomini-* *um Ass'n, Inc. v. Webb*, 163 S.W.3d 531, 536 (Mo.App.2005); *Heffernan v. Reinhold*, 73 S.W.3d 659, 663 (Mo.App.2002).

Johnson's claim for unjust enrichment was based upon an implied-in-law contract. *Dailing v. Hall*, 1 S.W.3d 490, 492 (Mo.App.1999). "Unlike a contract implied in fact, a contract implied in law is imposed, or created, without regard to the promise of the party to be bound." *Green Quarries, Inc. v. Raasch*, 676 S.W.2d 261, 264 (Mo.App.1984). Thus, "[a] contract implied in law is not actually a contract and, instead, is an obligation to do justice where no promise was ever made or intended." *Karpierz v. Easley*, 68 S.W.3d 565, 573 (Mo.App.2002). This noncontractual obligation is imposed to prevent unjust enrichment. *Id.*; *Dailing*, 1 S.W.3d at 492; *Green Quarries, Inc.*, 676 S.W.2d at 264.

It was Johnson's burden to prove her unjust enrichment claim against the Estate. *Anchor Centre Partners, Ltd. v. Mercantile Bank, N.A.*, 803 S.W.2d 23, 32–33 (Mo. banc 1991). The elements of this claim are: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted or retained the benefit under inequitable or unjust circumstances. *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo.App.2010). Recovery under an action

---

**2.** In *Hudson*, the issue was whether the trial court erred in finding an implied-in-fact contract between the parties to share assets accumulated during their relationship. *Hudson*, 732 S.W.2d at 926. In *Marvin*, the issue was whether the trial court erred in entering judgment on the pleadings. *Marvin*, 134 Cal.Rptr. 815, 557 P.2d at 110. According to the petition: (1) plaintiff and defendant entered into an oral agreement that, while they were living together, they would combine their effort and earnings and share any and all property accumulated as a result of their individual or combined efforts; (2) they would hold themselves out to the general public as husband and wife, and plaintiff would render services as a companion, homemaker, housekeeper and cook for defendant; and (3) he agreed to provide for all of plaintiff's financial support and needs for the rest of her life. *Id.* The California Supreme Court held that plaintiff's petition stated a cause of action for breach of an express contract. *Id.* at 123. In *Roccamonte*, the New Jersey Supreme Court held that the evidence was sufficient to prove a breach of contract because defendant either expressly or impliedly promised to support plaintiff for life. *Roccamonte*, 808 A.2d at 846.

for unjust enrichment is limited to the amount by which the defendant is unjustly enriched. *See Zipper v. Health Midwest,* 978 S.W.2d 398, 412 (Mo.App.1998).

■ With respect to the Residence, Johnson alleged that she made financial contributions to the cost of construction and provided labor in the completion of the home. Johnson also alleged that she made "significant financial contributions" to the acquisition of the Rental Property. Thus, the specific benefit that Johnson allegedly conferred upon McFarlin was the contribution of significant funds or labor toward the acquisition of the Residence and the Rental Property. After hearing the evidence, the trial court decided that Johnson failed to meet her burden of proof. The court made a specific factual finding that McFarlin's funds, rather than Johnson's funds, were used to purchase the Residence and the Rental Property. After reviewing the record, we conclude this finding is not against the weight of the evidence.

Before construction on the Residence commenced, McFarlin sold two parcels of real estate owned by him alone that generated $103,795 in cash. He used $4,000 of that sum to purchase the lot on which the Residence was built. That still left ample cash for McFarlin to pay the entire construction cost for the Residence, which was $80,000 to $84,000. While Johnson testified that McFarlin did not use any of the proceeds from these real estate sales to pay these construction costs, the trial court evidently disbelieved her testimony. The trial court also appears to have disbelieved Johnson's testimony that she performed any significant labor during construction of the Residence.

McFarlin purchased the Rental Property using $40,000 in borrowed funds that he alone was obliged to repay. He collected enough rent each month to cover the $500 per month mortgage payment. These rent payments were deposited into the Century account, which was the same account from which the mortgage payment was made. In June 2003, McFarlin sold the Gray House and used the proceeds of that sale to pay off the remaining $16,600 balance on the mortgage. The trial court simply did not believe that any of Johnson's funds were used to pay the mortgage payments or retire the debt, which was the court's prerogative.

*Turner v. Freed,* 792 N.E.2d 947 (Ind. Ct.App.2003), is the only unjust enrichment case cited by Johnson. We have examined that decision and find it factually distinguishable. In *Turner,* plaintiff Freed alleged that defendant Turner had been unjustly enriched by Freed's domestic services during a ten-year period of cohabitation. The appellate court upheld that trial court's determination that Turner would be unjustly enriched if Freed were awarded no part of the value of the assets Turner acquired in his name alone during their cohabitation. *Id.* at 950–51. *Turner,* is inapposite because Johnson did not base her claim for unjust enrichment upon the provision of domestic services to McFarlin. Instead, Johnson's trial theory was that she made significant financial contributions to the acquisition of the Residence and the Rental Property. She is bound by that theory on appeal. *Johnson v. Duensing,* 332 S.W.2d 950, 957 (Mo. 1960).

■■ We also note that Missouri law does not permit recovery on an unjust enrichment theory if the parties receive what they intended to obtain. *Am. Standard Ins. Co. of Wis. v. Bracht,* 103 S.W.3d 281, 293 (Mo.App.2003). It is clear from the record that Johnson willingly deposited her earnings into the Century account in exchange for all of her living expenses being paid. At trial, Johnson made no attempt to prove that her total contributions to the Century account exceeded

what McFarlin spent on Johnson's living expenses. In the absence of such evidence, there was no basis for the trial court to conclude that Johnson actually conferred a benefit on McFarlin.[3] Moreover, the record amply demonstrates that Johnson knew McFarlin was placing title to the Residence and the Rental Property exclusively in his name. Prior to McFarlin's death, Johnson did not assert any interest in either property or complain that McFarlin was being unjustly enriched by her contributions. She appeared satisfied with the arrangement between McFarlin and her. Finally, Johnson received a number of financial benefits from her cohabitation with McFarlin. She was not required to expend any of the funds she obtained in her divorce to support herself. Between 1993 and 2007, all of Johnson's living expenses were paid from the Century account. During that same time frame, $67,400 from that account was used to purchase vehicles for Johnson's use. After McFarlin's death, Johnson received $36,474 in funds, a vehicle worth $24,000 and furniture from the Residence. In addition, Johnson's own certificate of deposit was then worth $30,000. The trial court concluded that Johnson received at least as much from McFarlin as she contributed to him. We are not firmly convinced the trial court was wrong.

After reviewing the record, we hold that the judgment is not against the weight of the evidence. Johnson's point on appeal is denied, and the judgment is affirmed.

RAHMEYER, P.J., and SCOTT, C.J., Concur.

---

**3.** For example, the court made a specific finding that Johnson had only contributed $12,000 to the Century account by April 1995.

The record contains no evidence that the cost of Johnson's living expenses up to that point was less than $12,000.